IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 13, 2022

**STATE OF TENNESSEE v. ZACHERY BRANDON**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-C-1814     Mark J. Fishburn, Judge**

_____

**No. M2020-01092-CCA-R3-CD**

_____

The Defendant, Zackery Brandon[1], was convicted by a Davidson County Criminal Court jury of attempted aggravated robbery, especially aggravated robbery, and aggravated robbery and was sentenced by the trial court as a Range I, standard offender to an effective term of twenty-five years in the Tennessee Department of Correction.  On appeal, the Defendant argues that the evidence was insufficient to sustain his convictions and that the trial court erred in admitting the unsworn recorded statement of one of his co-defendants.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Michael L. Freeman (on appeal) and Kyle Parks (at trial), Nashville, Tennessee, for the appellant, Zackery Brandon.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn. R. Funk, District Attorney General; and Amy Hunter and Emily Todoran, Assistant District Attorneys General, for the appellee, State of Tennessee.


**OPINION**

**FACTS**

---

[1] The indictment and jury instructions spell the Defendant's first name with an h.  The Defendant's pleadings spell the first name with a k.  This Court's policy is to spell the Defendant's name as it appears in the indictment.

The Defendant's convictions stemmed from his participation with his brother, Jamie Brandon, and a third man, Cavelle Camron Rondo, in either robbing or attempting to rob convenience store clerks at three Nashville service stations during a crime spree that occurred in the late evening/early morning hours of August 29-30, 2015. All three men were indicted together for an attempted aggravated robbery at the Shell service station on Shelby Avenue at approximately 10:57 p.m. on August 29, 2015, an aggravated robbery at the Mystic Express service station on Nolensville Pike at approximately 1:30 a.m. on August 30, 2015, and an especially aggravated robbery at the Shell service station on Gallatin Road at approximately 2:16 a.m. on August 30, 2015[2]. Co-Defendant Rondo accidentally shot himself in the leg following the group's last robbery of the night and he and his co-defendants were arrested at Skyline Hospital, where they went to seek treatment for the gunshot wound. Prior to his arrest, Co-Defendant Rondo gave a recorded statement from his hospital bed to a police detective in which he provided details about each man's role in the robberies. Co-Defendant Rondo subsequently pled guilty to the offenses in exchange for a twenty-year sentence, leaving the Defendant and his brother to be tried together before a criminal court jury on September 20-21, 2017.

At trial, the attempted aggravated robbery victim, Aymen Waheb, testified that he and a friend were working at the Shell service station on Shelby Avenue on the night of August 29, 2015. He said his friend was in the bathroom and he was near the front door when a man armed with a pistol appeared outside the store. He stated that he ran to attempt to lock the door but the gunman entered quickly and said, "open the drawer."

Mr. Waheb testified that he was afraid for his life and began running from the gunman in a zigzag pattern toward the back of the store. The gunman chased him, but he managed to close himself inside a storeroom, where he remained until his friend eventually emerged from the bathroom and called the police. Mr. Waheb identified the store's surveillance video of the incident, which was admitted as an exhibit and published to the jury as Mr. Waheb narrated the action. The surveillance video reflects that the gunman, wearing black shoes and a belt with its end sticking out, entered the store after a different man dressed in a "fisherman's cap" and distinctive colorful red shoes had entered and then exited the store. The surveillance video further shows a third individual in a gray hoodie

---

[2] On September 16, 2016, the Davidson County Grand Jury returned a seven-count indictment that charged the Defendant, his brother, and Co-Defendant Rondo in counts five, six, and seven with the offenses at issue in the instant case. The three men and a fourth co-defendant, Corey Dewayne Thompson, Jr., were charged together in counts one through four of the indictment with three counts of aggravated robbery and one count of especially aggravated robbery based on similar robberies committed on August 26, 2015. Those counts were later severed from counts five through seven.

and blue shoes entering the store after the gunman had chased Mr. Waheb to the back of the store.

Ali Alibed, the aggravated robbery victim, testified that he was working at the Mystic Express service station on Nolensville Road [3]at approximately 1:30 to 2:00 a.m. on August 30, 2015, when a man armed with a pistol entered the store, followed closely by a second man. He testified that the gunman came around the counter, cursed him, and demanded money. He said the second man waited by the door for a moment and then came forward to take the money. After Mr. Alibed had brought out the cash drawer, the gunman saw the store's rolled coins and instructed Mr. Alibed to add them to the cash drawer, and he complied. The second man then grabbed the money and left the store, followed by the gunman, who cursed Mr. Alibed again before departing.

Mr. Alibed identified the store's surveillance video of the robbery, which was admitted as an exhibit and published to the jury. He also identified several items that had been recovered from the vehicle in which the Defendant and his co-defendants arrived at the hospital, which were admitted as a collective exhibit: rolled coins from the store, a plastic band used to roll the coins, and two store receipts. Mr. Alibed estimated that the robbers took $1,200 to $1,500 from the store and said that he feared that the gunman was going to shoot him.

On cross-examination, Mr. Alibed testified that he could not identify the gunman, who had his face covered, but he was face-to-face with the second robber, whom he thought he had been able to identify by his long hair from a photographic array he had been shown by the police. He then made a positive courtroom identification of Co-Defendant Jamie Brandon as the second robber. When asked if he was able to identify him by anything other than his hair, he responded "No."

Mohamed Adams, the victim of the especially aggravated robbery, testified that he was working with his uncle at their family's Shell service station on Gallatin Road in Madison when a man wearing a light brown hoodie and armed with a gun walked in, pointed the gun directly at his face, and ordered him to get back. When he and the gunman reached the counter where Mr. Adams' uncle was standing, the gunman ordered Mr. Adams to get on the floor. Mr. Adams testified that he refused to lie down on the floor, but he knelt down on one knee and told his uncle to give the man all the store's money.

Mr. Adams testified that when the gunman first entered the store, a second man dressed in a gray hoodie stood outside the front door "looking around" before entering the

---

[3] Although the witness referred to it as "Nolensville Road," a police officer later referred to it as "Nolensville Pike."

store and going straight to the counter to take the money from Mr. Adams' uncle. Mr. Adams said the gunman did not believe that he had given him all the store's cash, although he had. He stated that as the gunman was exiting the store, he turned and shot Mr. Adams.

Mr. Adams testified that he and his uncle did not have any weapons, did not resist, and had given the men all the store's money when the gunman turned and shot him. He said the bullet entered and exited his left buttock, causing him to bleed profusely and to experience a lot of pain. He was unable to walk for approximately three weeks, had to use a walker and then crutches when he was again able to walk, remained in pain for approximately two months, and was left with permanent scars from the entrance and exit wounds. He stated that the men took approximately $73 from the store. He testified that he was terrified during the ordeal and that he never again worked in the store.

Mr. Adams identified the store surveillance videotape, which was admitted as an exhibit and published to the jury. Mr. Adams identified a light brown hoodie and a gray hoodie, which were admitted as exhibits, and expressed one hundred percent certainty that they were the same hoodies that had been worn by the two robbers.

Mr. Adams testified that police officers showed him a photographic array of possible suspects after he was released from the hospital and he circled someone's photograph. However, he was in a lot of pain at the time and was unsure of his identification. He then made a positive courtroom identification of the Defendant as the man in the brown hoodie who had shot him, stating that he was one hundred percent certain in his identification. When asked how he could be so confident, he replied:

> Because I saw the nose and the two eyes and almost where, right here, and then the cheek, so I can tell exactly what he looks like. I mean, I'm not - - and then there's, I can tell from the nose, it was the person, he had a longer nose so that's how I can verify one thing about that too.

On cross-examination, Mr. Adams acknowledged that he circled the photograph of another man on the photographic array despite the fact that the Defendant's photograph was included on the same array. He said he was on pain medication and hazy and that he told the officers at the time that he was not certain in his identification. He stated that he realized his mistake when he saw the Defendant in person at a court hearing. He explained that the photograph was not clear and that he was able to recognize the Defendant when he saw him in person by the Defendant's longer nose, which did not show up in the photograph, and by his eyes. He was adamant that the Defendant was the man who shot him, stating:

- 4 -

Okay. Me and the person who shot me, we had eye contact. I was talking to him, I was telling him "put the gun down," and then he was talking to me too, so we had eye-to-eye contact and everything and I exactly remember the eyes, the nose. And then he was literally, everything was covered and then he had a longer hair, and then once one description was also at the end of the hair there was dyed in like a kind of yellowish color.

Detective Eric Funk of the Metro Nashville Police Department testified that he showed Mr. Adams three separate six-person photographic arrays at 7:11 a.m. on August 30, 2015, approximately five hours after the robbery and shooting. Mr. Adams, who was in his bed at his home, was unable to make any identifications from the arrays that contained the co-defendants' photographs. However, in the array containing the Defendant, Mr. Adams identified someone other than the Defendant. On cross-examination, Detective Funk testified that he had no knowledge of whether any investigation was conducted of the man whose photograph Mr. Adams had circled. He could not recall if Mr. Adams expressed any level of certainty in his identification of that man.

Mohamed Adas, Mr. Adams' uncle, testified that he was stocking cigarillos at approximately 2:15 a.m. on August 30, 2015, when a man wearing a hoodie came into the store. He said he did not pay any attention until his nephew told him that they were being robbed. When he looked up, he saw that the man had a gun pointed toward his nephew and was backing his nephew up toward the register. At about that time, another man with a long forehead came into the store. Mr. Adas testified that his nephew was trying to convince the gunman to lower his gun and was telling him that they would give him everything he wanted. Mr. Adas stated that he got mad at his nephew for not complying with the gunman's orders to get down on his knees because he was afraid that the gunman would start shooting. He said he told his nephew to kneel, and then he opened the cash register, took out the money, and passed it to his nephew, who in turn passed it to the gunman.

Mr. Adas testified that the gunman got angry at the small amount of money they gave him, saying, "f***, that's all the money?" He said he apologized, told the gunman that they had just dropped cash into the store's safe, and offered to open the safe. He stated that the gunman knew it took about fifteen or twenty minutes for them to open the safe "so he didn't even answer." Mr. Adas next heard a gunshot and then saw his nephew "running around with pain and stuff" and realized his nephew had been shot. He said he was unable to identify either robber.

Mr. Mohamed Adams, recalled as a witness by the State, testified that earlier that morning, at the request of the prosecutors, he had watched a video of a December 14, 2015

court hearing involving the Defendant. After a portion of the video was played in open court, Mr. Adams agreed that he had positively identified the Defendant at that hearing. He then made a second positive courtroom identification of the Defendant as the man in the brown hoodie who had shot him and whom he had previously identified during the December 14, 2015 court hearing.

On cross-examination, Mr. Adams testified that it was not until he saw the Defendant in person that he realized he had made a mistake in the photographic identification. On redirect examination, he agreed that seeing someone in person was very different from viewing their image in a black and white photograph. On recross-examination, he insisted that he told the officers at the time that he made the erroneous identification that he did not want to attempt an identification at that time because he was on medication and uncertain about his ability to make an identification.

Officer Justin Cregan of the Metro Nashville Police Department's Crime Unit identified photographs of the Chevrolet Lumina in which the Defendant and his co-defendants arrived at the hospital, which showed a blood-stained backseat and floorboard, blood-stained cash scattered inside and outside the vehicle, and a gray hoodie on the ground outside the vehicle. He also identified various items that he had collected into evidence, including the following items that a detective brought him inside a plastic hospital bag: a brown hoodie, black jeans, blue Nike shoes, and a high school identification card with the Defendant's name and photograph.

Sergeant Stephen Weir of the Metro Nashville Police Department, who responded to the Gallatin Road Shell service station robbery and shooting, testified that when he reviewed the store's surveillance video he observed "two male blacks enter the store at approximately 02:16 hours, one suspect was wearing a tan hood[ie] and black pants, the other was wearing a gray hood[ie] and black pants[.]". He said the suspect in the "tan hood[ie]" demanded money and then turned and shot Mr. Adams on his way out of the store.

On cross-examination, he acknowledged that the police incident report on Co-Defendant Rondo's accidental shooting, which he had approved as supervising officer, stated that "Victim Rondo was wearing a brown hood[ie] that matched the description of the suspect." He said he was not at the hospital to see who was wearing the "brown hood[ie]" and that he approved the incident report on the assumption that the information in it was correct.

In a jury-out hearing, Co-Defendant Cavelle Rondo declared his refusal to testify and claimed a lack of memory about the offenses or how he came to be shot. Detective Russell Thompson then testified about the circumstances in which he had recorded a

hospital-room statement by Co-Defendant Rondo using an application he downloaded to his cell phone. At the conclusion of the hearing, the trial court found that there was nothing about the application to suggest it was any less trustworthy than traditional recording equipment. The court also found that it "was satisfied that the contents of the interview that was recorded . . . is trustworthy." The court, therefore, ruled that the State could play the recording if Co-Defendant Rondo, called as a witness before the jury, again claimed lack of memory.

When the jury returned, the State called Co-Defendant Rondo as a witness. Co-Defendant Rondo, who refused to be sworn, agreed that he did not like the prosecutor, did not want to be present, and did not want to answer any questions. As he had in a jury-out hearing, he claimed that he had no memory of the night of August 29-30, 2015, other than of being arrested. He acknowledged having appeared in court, where he was represented by a lawyer and "signed the little paper, plea paper" to get his "deal." He further acknowledged having consistently maintained that he would never testify in court.

The prosecutor then played the interview that Detective Thompson had conducted with Co-Defendant Rondo in which Co-Defendant Rondo implicated the Defendant in the offenses. Afterwards, the prosecutor asked if Co-Defendant Rondo had heard the recording and if it refreshed his recollection. Co-Defendant Rondo responded "Nope" to both questions, said he was not really listening, and claimed a lack of memory to the remaining questions.

Officer Michael Reid of the Metro Nashville Police Department, the author of the incident report that stated that Co-Defendant Rondo had been wearing the light brown hoodie seen in the Gallatin Road Shell service station surveillance video, testified that he had no personal knowledge of which individual had been wearing the brown hoodie and had made assumptions that may not have been correct. He further testified that he collected into evidence the cash that other officers recovered from the persons of the Defendant and Co-Defendant Jamie Brandon at the hospital. According to his records, $319.12 was collected from the Defendant and $280 from Co-Defendant Jamie Brandon. On cross-examination, he testified that he had assumed that Co-Defendant Rondo had been wearing the brown hoodie because it was included with Co-Defendant Rondo's personal effects in the emergency room.

Metro Nashville Police Officer John JeanBaptiste testified that he was working an extra job as a police officer at Skyline Hospital on August 30, 2015, when he received a call from the nursing staff at 2:50 a.m. that a gunshot victim had arrived in a vehicle. When Officer JeanBaptiste arrived outside the emergency room, Co-Defendant Rondo was being removed from the backseat and the Defendant was standing outside the vehicle. Co-Defendant Jamie Brandon was initially reluctant to answer any questions but finally told

Officer JeanBaptiste that Co-Defendant Rondo had called him to pick him up in East Nashville after he was shot. The Defendant, on the other hand, told Officer JeanBaptiste that Co-Defendant Rondo was his brother and that he had been with Co-Defendant Rondo when Co-Defendant Rondo was shot. Officer JeanBaptiste then patted down Co-Defendant Jamie Brandon and found a large bulge of cash in his pocket. After finding another large bulge of cash in the Defendant's pocket, Officer JeanBaptiste detained both men and turned the cash over to the responding officers.

On cross-examination, Officer JeanBaptiste acknowledged that he found no weapons on either man and that the Defendant never said where he and Co-Defendant Rondo were located when Co-Defendant Rondo was shot. On redirect examination, Officer JeanBaptiste testified that, in addition to the men's conflicting accounts, his suspicions were aroused by the fact that he had heard radio reports about the robberies, there was money "all over the back of the vehicle," both men were "really nervous," and Co-Defendant Jamie Brandon became hostile when questioned.

Detective John McGowen of the Metro Nashville Police Department, who was assigned to investigate the Mystic Express service station robbery, testified that he showed three separate photographic arrays to Mr. Alibed, but he was unable to make any identifications. He said he reviewed the surveillance videos of the Mystic Express and Gallatin Road Shell service station robberies, as well as Skyline Hospital's surveillance videos, and noted that they appeared to show the same individuals. He identified still photographs from the surveillance videos, which were admitted as exhibits. He also identified photos of rolled coins and store receipts found during the search of the Chevrolet Lumina and said that he determined the items were from the Mystic Express service station.

Detective Erin Riley of the Metro Nashville Police Department testified that she was called to the Mystic Express service station on Nolensville Pike at 1:27 a.m. on August 30, 2015. She said she reviewed the surveillance video of the robbery, took a still photo from the surveillance video, and sent the photo to the lead detective. She identified the photo, which was admitted as an exhibit.

Detective Jesse Holt of the Metro Nashville Police Department identified photographs he had taken of the Defendant and Co-Defendant Jamie Brandon early on the morning of August 30, 2015, at a police station. He said Co-Defendant Jamie Brandon was wearing camouflage shorts, black socks, a black "Just Do It" shirt, and distinctive "very colorful" reddish shoes, which also "show[ed] up very well" on the surveillance video of the Shelby Avenue Shell service station robbery. The Defendant was wearing black shoes with a "very distinct bright [silver] buckle" and pants with an "oversized belt" that stuck out "quite a bit[.]"

Detective Holt testified that he first viewed the Shelby Avenue Shell service station surveillance video on September 1. He said a man who entered and then exited the store immediately before the gunman was wearing camouflage shorts, distinctive colorful shoes, some kind of pullover, and a round "boony cap" similar to a fisherman's cap, but "kind of oddly colored." The gunman who entered the store approximately a minute after the first man exited was wearing a hoodie pulled tightly around his face, black pants, black shoes with a bright silver buckle and an oversized belt with its end sticking out. A third man who entered the store after the gunman was wearing blue shoes and a gray hoodie. After he viewed the surveillance video of that attempted robbery and saw that the clothing matched that of the defendants, Detective Holt created still photographs from the surveillance video. He identified those still photographs of the suspects, which were admitted as a collective exhibit.

Detective Holt testified that he showed Co-Defendant Jamie Brandon still photographs from the Shelby Avenue Shell service station surveillance video during an interview. He said Co-Defendant Brandon identified himself as the first individual who walked into the store wearing the fisherman's hat, brightly colored reddish shoes, and camouflage shorts. As the interview continued, Co-Defendant Brandon "opened up to [Detective Holt]" eventually telling him that he had acted as the lookout and "designated driver."

On cross-examination, Detective Holt testified that he attempted to interview the Defendant on August 30, but the Defendant declined to sign the waiver of rights form. On redirect examination, he testified that he later saw the items found during the search of the Chevrolet, which included a sweatshirt and a fisherman's hat with a distinctive design, which appeared to match the clothing that Co-Defendant Jamie Brandon identified himself as wearing in the Shelby Avenue Shell service station surveillance video.

Detective Russell Thompson of the Metro Nashville Police Department testified that he responded to Skyline Hospital early on the morning of August 30, 2015, based on a report of two shooting victims: Co-Defendant Rondo and Mr. Mohamed Adams. He said he spoke briefly with Mr. Adams at the hospital but was unable to speak with Co-Defendant Rondo, who was in "[v]ery, very serious" condition and receiving medical treatment. He observed some clothing in the emergency room where the staff were working on Co-Defendant Rondo and was later given the clothing by the emergency room staff. He then turned over the items, which included a brown hoodie, pants, shoes, and the Defendant's high school identification card, to the crime scene investigator.

Later that afternoon, he returned to the hospital, learned that Co-Defendant Rondo had been moved to a regular room, and went to see him. Although he had not originally intended to interview him and did not have his recording equipment with him, he found

Co-Defendant Rondo very alert, very cooperative, and willing to give a statement. He, therefore, stepped briefly out of his hospital room, downloaded a recording application on his cell phone, and went back into Co-Defendant Rondo's room to record his statement, which was essentially a "continuation of a conversation" that he and Co-Defendant Rondo had already begun.

Detective Thompson testified that he was curious why the Defendant's school identification and the brown hoodie were included in Co-Defendant Rondo's personal effects from the emergency room, so he watched the hospital's surveillance videos of the defendants' arrival outside the emergency room and the medical staff bringing Co-Defendant Rondo inside the emergency room. He identified the surveillance videos and a still photograph taken of Co-Defendant Rondo on the hospital gurney, which were admitted as exhibits and published to the jury. From those surveillance videos and photographs, he identified the Defendant as the individual who exited the front passenger seat of the vehicle, Co-Defendant Jamie Brandon as the individual who exited the driver's seat, and Co-Defendant Rondo as the individual who was taken out of the rear seat of the vehicle and placed on the hospital gurney. He also identified the brown hoodie as the same brown hoodie visible in the emergency room surveillance video and still photograph, which was used to cover Co-Defendant Rondo's leg in an apparent attempt to stem the bleeding from his gunshot wound.

Detective Thompson testified that he spoke with the registered owner of the Chevrolet, Ms. Rowena Crowell, who told him the day and time that she had last been in the vehicle. He then reviewed downtown street surveillance videos, which corroborated her account of having turned the vehicle over to Co-Defendant Jamie Brandon at approximately 12:51 a.m. on August 30, 2015.

Detective Thompson testified that Co-Defendant Jamie Brandon provided a statement to him and other detectives on September 1, 2015. Co-Defendant Brandon admitted that he was the driver during the Mystic Express and Gallatin Road Shell service station robberies, that he expected to share in the robbery proceeds, that Co-Defendant Rondo shot himself in the vehicle, and that he instructed Co-Defendant Rondo to get rid of the weapon before he agreed to drive him to the hospital. Co-Defendant Jamie Brandon also identified himself in the surveillance video of the attempted aggravated robbery as the individual wearing the fisherman's hat.

Detective Thompson testified that he interviewed the Defendant on September 1, 2015. He said his questioning was focused exclusively on the case that had been assigned to him, which was the Gallatin Road Shell service station robbery. During that hour and a half interview, the Defendant eventually admitted that he had been involved in dropping the owner of the Chevrolet Lumina off downtown and that he was in the vehicle when Co-

Defendant Rondo shot himself. The Defendant also admitted he had gone into the Gallatin Road Shell service station to get money from a male employee. When he asked the Defendant for details, the Defendant responded "you already know." On cross-examination, Detective Thompson testified that the Defendant was responding to his specific questions about the Gallatin Road robbery when he made his admissions.

Neither the Defendant nor Co-Defendant Jamie Brandon elected to testify and neither presented any defense witnesses. Following deliberations, the jury convicted the Defendant of the indicted offenses. No motion for new trial was filed. The Defendant filed a notice of appeal on August 18, 2020, to which the State responded with a motion to dismiss based on its untimeliness. The lawyer who represented the Defendant at the time of the filing of his notice of appeal was allowed to withdraw from representation, and this court subsequently granted the Defendant's new counsel's request to waive the timely notice of appeal requirement in the interest of justice.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions, arguing that the evidence linking him to the crimes was "purely circumstantial and very attenuated." He asserts that no one identified him as a participant in the Shelby Avenue and Nolensville Pike offenses and argues that "no reasonable rational person could determine" that he participated in either of those crimes. He characterizes his statement to police about his involvement in the Gallatin Road especially aggravated robbery as an "open book response that lacks exact meaning and can be interpreted in many ways" and points out that the victim in that crime originally identified someone else as the perpetrator. The State argues that there was overwhelming proof of the Defendant's participation in all three crimes. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657

S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Viewed in the light most favorable to the State, the evidence was more than sufficient for the jury to find that the Defendant was a participant not only in the especially aggravated robbery of Mr. Adams at the Gallatin Road Shell service station, but also the aggravated robbery of Mr. Alibed at the Nolensville Pike Mystic Express service station and the attempted aggravated robbery of Mr. Waheb at the Shelby Avenue Shell service station. The jury saw the surveillance videos and still photographs of the robbers. The jury also saw the photographs of the Defendant and his brother taken early on the morning of August 30, that showed the Defendant dressed in the same distinctive shoes and belt worn by the gunman in the attempted aggravated robbery and the aggravated robbery. Mr. Adams positively and unequivocally identified the Defendant as the man who robbed and shot him, and the Defendant admitted in his statement to Detective Thompson that he went into the Gallatin Road Shell service station to get money from a male employee. The co-defendants also each made statements implicating the Defendant in the crimes. Finally, the Defendant, who had a large bulge of cash on his person, arrived at the hospital early on the morning of the August 30, 2015, with his two co-defendants in a vehicle that contained blood-stained cash, rolled coins, and receipts from the Mystic Express service station. From all of this evidence, a rational jury could reasonably find that the Defendant was a participant in all three offenses. We, therefore, affirm the Defendant's convictions for attempted aggravated robbery, aggravated robbery, and especially aggravated robbery.

## II. Admission of Co-Defendant Rondo's Recorded Statement

The Defendant contends that the trial court committed prejudicial error by admitting Co-Defendant Rondo's out-of-court statement to Detective Thompson as substantive evidence "while allowing another witness, Mohamed Adams, to recant his identification of another person in the hours after being shot when he discovered that it was, in fact, [the] Defendant [] who was on trial for the crime." The Defendant concedes that the trial court

held an out-of-court hearing at which it found that the recording was trustworthy and satisfied the requirements of Rule 803(26) of the Tennessee Rules of Evidence for a prior inconsistent statement of a testifying witness. The Defendant argues, however, that the trial court erred in admitting the recording because Co-Defendant Rondo, who refused to be sworn, was not a witness who testified at trial and was subject to cross-examination and the recorded statement itself was not trustworthy. The State responds that that the Defendant is not entitled to plain error relief on the basis of this issue. We, again, agree with the State.

Because the Defendant failed to raise this issue in a motion for new trial, he is limited to plain error review. Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . ., unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"). The doctrine of plain error provides that where necessary to do substantial justice, an appellate court may take notice of a "plain error" if it affected a substantial right of the defendant. Tenn. R. Crim. P. 36(b). In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641–42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. *Id.* at 283. Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial.'" *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

We agree with the State that the Defendant has not established the existence of plain error, as he cannot show that a clear and unequivocal rule of law was breached, that a substantial right of his was adversely affected, or that consideration of the alleged error is necessary to do substantial justice. Accordingly, we conclude that the Defendant is not entitled to relief on the basis of this issue.

# CONCLUSION

Based on the foregoing review of the record and analysis of the issues, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE